# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRIUS LIKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:10-CV-2989-VEH** |
| | ) | |
| **DHL EXPRESS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

## I.     INTRODUCTION

Plaintiff Darrius Likes ("Mr. Likes") initiated this employment dispute arising under the Worker Adjustment and Retraining Notification Act,  29 U.S.C. §§ 2101-2109 ("WARN") against Defendant DHL Express ("DHL") on November 5, 2010. (Doc. 1). On December 21, 2012, the court denied Mr. Likes's request to  have his lawsuit certified as a class action with him serving as the class representative under Rule 23(b)(2) or (3) (Doc. 44) and, since then, the case has proceeded as an individual liability one only.[1]

Mr. Likes's complaint contains only one count. (Doc. 1 at 11-12 ¶¶ 50-59).

---

[1]  On February 27, 2013, the Eleventh Circuit denied Mr. Likes's Petition for Permission to appeal this court's Rule 23 decision. (Doc. 49).

More specifically, Mr. Likes contends that "DHL Express violated the WARN Act with respect to the plaintiff . . . by failing to give 60 days advance notice as required prior to a mass lay-off or plant closing." (Doc. 1 at 11 ¶ 51).

Pending before the court is DHL's Motion for Summary Judgment (Doc. 56) (the "Motion") filed on January 6, 2014. On January 6, 2014, DHL also filed several evidentiary materials in support of its Motion. (Docs. 57-61).

After obtaining multiple extensions of time, Mr. Likes filed his opposition (Docs. 66-68) to the Motion on March 11, 2014. On April 25, 2014 (and also after securing an extension), DHL followed with its reply. (Doc. 71). Finally, on April 25, 2014, Mr. Likes filed a corrected version of his opposition brief. (Doc. 72). Accordingly, the Motion is now under submission, and, for the reasons explained below, is due to be granted in part and otherwise termed as moot.

## II.   FACTUAL BACKGROUND[2]

### <u>DHL's Business Model And Operations</u>

DHL provides shipping services through a global network of gateways, hubs,

---

[2]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party).This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

warehouses, and terminals to administer customer needs. AF No. 1.1[3] Express delivery is one of DHL's many business lines. AF No. 1.2. Based on the demands within its express delivery business, DHL engages independent contractors to facilitate parcel pick-up and delivery in specifically defined geographic territories. *Id.* Those companies with whom DHL contracts have no corporate affiliation, no common owners, no common officers or directors, and no common decision-makers with DHL. AF No. 4.

Up until roughly the first part of 2009, DHL offered express delivery services within the United States. As a result of economic losses totaling an estimated eleven billion dollars experienced over an approximate five-year span from 2003 to 2008

---

[3] The designation "AF" stands for admitted fact and indicates a fact offered by DHL that Mr. Likes has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under appendix II of the court's uniform initial order (Doc. 5) entered on February 14, 2011, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Mr. Likes, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Mr. Likes has inadequately asserted a dispute over a fact that DHL has otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports DHL's factual assertion, has accepted DHL's fact. On the other hand, whenever Mr. Likes has adequately disputed a fact offered by DHL, the court has reviewed the evidence cited by Mr. Likes and, if it in fact fairly supports Mr. Likes's factual assertion, has accepted Mr. Likes's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of DHL's statement of undisputed facts as set forth in Doc. 56 and responded to by Mr. Likes in Doc. 72. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 1.2) would indicate the second sentence of paragraph 1 of the DHL's Statement of facts is the subject of the court's citation to the record.

(Doc. 66-2 at 47 at 185),[4] DHL decided to cease its domestic express delivery services, which winding down process played out over the course of a number of months. AF No. 23. When domestic delivery was still a component of its express delivery business, DHL utilized independent contractors in over 86% of its delivery areas within the United States. AF No. 1.2; (*see also* Doc. 67-3 at 3 (DHL's substantive response to interrogatory No. 3)).[5]

Separate but, for the most part, uniformly worded, cartage agreements ("CAs") govern the commercial relationship between DHL and its contractors. Such contracts require that all contractors:  (i) wear DHL branded clothing consistent with DHL's trademark guidelines; (ii) drive vehicles with DHL branded logos when delivering DHL packages; and (iii) refrain from making any non-DHL deliveries when wearing DHL branded clothing or driving DHL branded trucks. (Doc. 59-1 at 5 § 3.5.3; *id.* at 6 § 3.14).[6] Bill Talon ("Mr. Talon"), DHL's current head of Ground Operations for the Americas Division, recalled that, prior to ceasing its domestic express delivery operations, DHL only permitted two out of its three hundred contractors to make non-

---

[4]  The first page references to Doc. 66-2 correspond with the court's CM/ECF numbering system and the second page references correspond with the numbering of the deposition transcript.

[5]  All page references to Doc. 67-3 correspond with the court's CM/ECF numbering system.

[6]  All page references to Doc. 59-1 correspond with the court's CM/ECF numbering system.

DHL deliveries. (Doc. 66-3 at 12 at 43-44).[7]

In addition to the CAs, domestic contractors were asked to execute termination and transition agreements ("TTAs") when DHL was winding down its express delivery services within the United States. (Doc. 57-1 at 2-8).[8] These TTAs subsumed the CAs as the governing document between DHL and its domestic contractors and included provisions for funding to the contractors for courier wages, returning DHL branded products, covering insurance payments, and protecting DHL's brand. *Id.*

### DHL's Birmingham Contractors and Mr. Likes's Employment

Mr. Likes was employed as a delivery courier by Wood Air Freight, Inc. ("WAF"), one of DHL's domestic contractors that operated out of a facility located in Birmingham. AF No. 5. DHL contracted with two other independent companies–Sky Land Express, Inc. ("Sky Land") and Territory Reps, Inc. ("Territory Reps")–who operated out of the same Birmingham facility as WAF. AF No. 8.1.

WAF began operations in 1981 and had its own set of employee policies and procedures in place for much of that time. AF No. 7.2. WAF's owner and president was Thomas Wood ("Mr. Wood") who, in addition to overseeing the company's

---

[7]  The first page references to Doc. 66-3 correspond with the court's CM/ECF numbering system and the second page references correspond with the numbering of the deposition transcript.

[8]  All page references to Doc. 57-1 correspond with the court's CM/ECF numbering system.

day-to-day operations, was the person solely responsible for negotiating the terms of all contracts between WAF and DHL. AF No. 7.1. WAF first contracted to provide pick-up and delivery services for DHL in 2005, and their contractual relationship lasted until early 2009. AF No. 7.3. During this time period, 100% of WAF's revenues came from its relationship with DHL. (Doc. 61-1 at 13 at 47).[9]

DHL never employed Mr. Likes and his limited base of knowledge concerning WAF's commercial dealings with DHL derives exclusively from his employment with WAF as a delivery courier. AF Nos. 6.1, 6.2. In his position, Mr. Likes spent 90 % of his day alone in his delivery vehicle. AF No. 6.2. Further, Mr. Likes had no responsibility related to any contract negotiations between WAF and DHL, did not supervise other WAF employees, spent "limited time" interacting with other WAF employees, and expended "even less time" coming into contact with employees of other independent contractors. AF No. 6.3.

DHL and WAF had a CA in place until that agreement (Doc. 59-2 at 1-24)[10] was subsumed by their TTA dated November 20, 2008. (Doc. 57-1 at 2-8).Through the CA, DHL and WAF expressly intended to and did enter an independent contractor relationship. AF No. 11.1. During its relationship with DHL, WAF's handling of its

---

[9]  The first page references to Doc. 61-1 correspond with the court's CM/ECF numbering system and the second page references correspond with the numbering of the deposition transcript.

[10]  All page references to Doc. 59-2 correspond with the court's CM/ECF numbering system.

obligations under the CA was in WAF's sole discretion although the CA did contain detailed terms regarding compliance with certain contract performance measures applicable to the use of DHL branded uniforms and vehicles. AF No. 15; (*see also* Doc. 59-1 at 3 § 3.1 (referencing DHL requirements regarding contractor's provision of cartage services)).

Under the CA, WAF was solely responsible for hiring its own workforce and for handling all other employment-related issues, including disciplining its employees and processing payroll checks. (*See* Doc. 61-1 at 4 at 12 (Mr. Wood's answering affirmatively that he chose who WAF hired, decided how many WAF hired, and determined how to assign any WAF hirees); *id.* at 5-6 at 16-17 (Mr. Wood's confirming that he set the rates of compensation and ensured the processing of payroll for all WAF employees)). WAF also addressed any customer complaints. AF No. 19.

However in contrast to the CA, under the TTA, DHL assisted in the attrition of employees, established a formula for payment of wages, and required proof of couriers' termination for contractors to collect their payments. (Doc. 57-1 at 4 ¶ 6.d; *see also* Doc. 66-2 at 65 at 256 ("As a result of that, we decided to think about some compensation model to allow them the opportunity to continue their business moving forward, as well as qualify a plan to help them attrit their staff, their couriers from the organization, their organization, as they saw fit.")).

As part of the TTA, WAF identified that its workforce included 20 full-time employees and 1 part-time employee. AF No. 25. One component of the TTA was the Contractor Employee Retention Program ("CERP"). AF No. 27.1. Through the CERP, DHL sought to protect its customer relationships and its brand name by ensuring that independent contractor companies did not lose focus on their DHL contracts during such a period of uncertainty. AF No. 27. The CERP resulted from negotiations with independent contractor companies who approached DHL to identify a mutually beneficial solution to concerns related to the restructuring of DHL's domestic express delivery services. AF No. 28. Based on information provided by WAF to DHL in March 2009,[11] WAF made CERP payments to a total of 19 employees, including Mr. Likes. AF No. 30; (Doc. 57-3 at 4).[12] Based upon the applicable CERP payment schedule, 1 of the 19 employees paid was a part-time worker, leaving 18 full-time compensated positions. (*See* Doc. 57-3 at 4 (reflecting 1 employee receiving $1,200 CERP payment signifying compensation for part-time labor)).

While Mr. Likes lacks direct knowledge of how many employees were laid off by DHL's other Birmingham-based contractors during the domestic express delivery

---

[11]  The documentation provided by WAF as part of the TTA reflects that, as of November 20, 2008, WAF had 18 full-time employees, 2 management employees, and 1 part-time employee who were scheduled to receive CERP payments. (Doc. 66-1 at 9).

[12]  All page references to Doc. 57-3 correspond with the court's CM/ECF numbering system.

winding down process (*see* Doc. 66-1 at 3 ¶ 6 ("Including the drivers from the other contractors, and the DHL station agents, I <u>estimate</u> there were in excess of 50 persons working in the Birmingham terminal in the handling of packages exclusively for [DHL].") (emphasis added)),[13] the CERP documentation applicable to Sky Land shows that 26 Birmingham-based full-time employees and 3 management employees were scheduled to receive wind-down payments. (Doc. 66-1 at 6, 8). Additionally, the documentation applicable to Territory Reps reflects that 17 Birmingham-based full-time employees and 5 management employees were eligible to receive CERP compensation. (Doc. 66-1 at 7). Aggregating those anticipated full-time employees of other Birmingham-based contractors with those full-time ones actually laid off by WAF equals 69 (29 + 22 + 18 = 69). (*See also* Doc. 66-1 at 11-12 (substantiating DHL's "**CARTAGE PAYABLES**" for WAF, Sky Land, and Territory Reps)).[14]

## III.   STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R . Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved

---

[13]  All page references to Doc. 66-1 correspond with the court's CM/ECF numbering system.

[14]  Unlike with WAF, the court does not see where <u>actual</u> CERP payments applicable to the employees of Sky Land and Territory Reps are substantiated in the record.

in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,  91 L. Ed. 2d 202 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## IV.   ANALYSIS

DHL's Motion presents three primary contentions:  (i) Mr. Likes is precluded from pursuing his WARN claim against DHL because another district court has previously concluded that DHL was not his employer under the Fair Labor Standards

Act (Doc. 56 at 17);[15] (ii) even if the res judicata and collateral estoppel doctrines do not apply, summary judgment still is appropriate because the evidence shows that DHL was not Mr. Likes's employer under 20 C.F.R. § 639(a)(2) (*id.* at 28);[16] and (iii) regardless of DHL's status as Mr. Likes's employer, Mr. Likes still cannot make a *prima facie* showing under WARN. (*Id.* at 44). For the reasons explained below, DHL's Motion is due to be granted as to its third ground and otherwise termed as moot.

## A.   WARN *Prima Facie* Elements

In *International Union, United Mine Workers v. Jim Walter Resources, Inc.*, 6 F.3d 722 (11th Cir. 1993), the Eleventh Circuit described the nature of a WARN

---

[15]   All page references to Doc. 56 correspond with the court's CM/ECF numbering system.

[16]   Regarding separate versus unified employing entities under WARN, 20 C.F.R. § 639.3(a)(2) provides:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

*Id.* At least one court of appeals has concluded that the presence of corporate parental or other shared ownership is not essential for § 639.3(a)(2) to apply. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 494-95 (3d Cir. 2001) ("[T]he DOL factors are an appropriate method of determining lender liability as well as parental liability, and therefore [we] hold that, regardless of whether GECC took on the status of 'parent' in addition to its status of 'lender' when it foreclosed on the stock, its involvement with CompTech will be tested by reference to those factors.").

11

claim as:

> WARN requires that an employer provide sixty days notice to workers before ordering a mass layoff. 29 U.S.C. § 2102(a). JWR argues that the layoff in question was not a mass layoff and, therefore WARN does not apply. WARN defines a mass layoff as a reduction in force that
>
> > (B) results in an employment loss at the <u>single site of employment</u> during any 30-day period for-
> >
> > > (i)(I) at least 33 percent of the employees (excluding any part-time employees); <u>and</u>
> > >
> > > (II) <u>at least 50 employees (excluding any part-time employees)</u>; or
> > >
> > > (ii) at least 500 employees (excluding any part-time employees);
> >
> > . . .
>
> 29 U.S.C. § 2101(a)(3)(B). The Union contends that JWR violated section 2101(a)(3)(B)(ii) because JWR laid off at least 500 employees from a single site of employment. <u>The Union can satisfy the statutory requirement that at least 500 workers be laid off from a single site of employment only by aggregating the layoffs from three of the four mines</u>.

*Jim Walter Resources*, 6 F.3d at 724 (emphasis added). Thus, the crux of the summary judgment appeal in *Jim Walter Resources* turned upon the definition of the term "single site of employment" and its application in the context of mining operations. *See id.* at 727 ("The Union fails to demonstrate that any combination of three of the four mine sites should be considered together as a "single site of

12

employment" under WARN.").

**B.    Mr. Likes Cannot Show That A Mass Layoff, Triggering WARN Notice Requirements, Occurred.**

Assuming without deciding that neither res judicata, nor collateral estoppel, nor the absence of sufficient evidence to support DHL's status as Mr. Likes's employer under a single employer liability theory,[17] precludes Mr. Likes from pursuing his WARN claim, summary judgment in favor of DHL is still, nevertheless, appropriate. In particular, Mr. Likes lacks evidence from which a reasonable jury could conclude that 50 or more full-time employees were let go from a single site. Based solely upon the 18 full-time WAF employees that actually received CERP payments, Mr. Likes cannot satisfy WARN's mass layoff definition. *See* 29 U.S.C. § 2101(a)(3)(B)(i)(II) (defining mass layoff to mean an "employment loss" totaling "at least 50 employees (excluding any part-time employees)").

In an effort to overcome this statutory numerical obstacle, Mr. Likes urges this court to permit him to aggregate all the adversely affected employees working for DHL's Birmingham-based contractors as a WARN-covered "single site of

---

[17] For the purposes of this Motion only, the court, as indicated above, has assumed that Mr. Likes is able to benefit from the unified employer approach pursuant 20 C.F.R. § 639.3(a)(2) and, therefore can meet WARN's requirement that a covered employer employ 100 employees by combining WAF's workforce with that of DHL. *See* 29 U.S.C. § 2101(a)(1) (defining "employer" to mean "any business enterprise that employs–(A) 100 or more employees, excluding part-time employees[.]").

employment." WARN does not statutorily clarify what "single site of employment" means.

DHL counters that, in the absence of a statutory definition for that term:

[T]he DOL's interpretative regulations are informative as to what should and should not be considered a single site of employment. *See* 20 C.F.R. §639.3(i). Specifically, the regulations provide that "**[t]here may be several single sites of employment within a single building**, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment." 20 C.F.R. §639.3(i)(2). This illustration—directly from the DOL regulations—applies here. Indeed, in interpreting this regulation, the Sixth Circuit confirmed that two plants only steps away from one another which were operated by the same employer did not constitute a single site of employment. *See generally Salyer v. Universal Concrete Products*, 940 F.2d 662 (6th Cir. 1991). The Eleventh Circuit endorsed the reasoning in *Salyer* that "separate management, produc[tion of] different products, and [] separate workforces" is central to separate sites of employment. *See Int'l Union, United Mine Workers v. Jim Walter Resources, Inc.*, 6 F.3d 722, 725 (11th Cir. 1993).

Applying the DOL illustration and case law to the present circumstance confirms that much more than operating out of the same facility is necessary to aggregate employees of different corporate entities into a single site of employment for purposes of WARN. Here, each of the three independent contractors had separate management, separate workforces, and serviced different delivery territories. *See* Likes Depo., 63:7–64:4. . . .

Plaintiff can offer no evidence to dispute that each of the DHL independent contractors in Birmingham operated autonomously. Accordingly, there is little doubt that each independent contractor constituted its own "site of employment" under WARN, and not one

14

large "single site" made up of all three independent contractors.

(Doc. 56 at 47-49 (emphasis in original)).

In *Jim Walter Resources*, the Eleventh Circuit affirmed the district court's decision on summary judgment that "none of JWR's four mine sites should be considered together as a 'single site of employment under WARN.'" 6 F.3d at 726. As supporting evidence, the Eleventh Circuit pointed out:

> First, the <u>mines are managed independently</u> with a different Mine Manager, Assistant Mine Manager, Industrial Relations Supervisor, Safety Supervisor, and Strata Control Engineer at each mine. Second, the <u>mines do not ordinarily share employees</u>. While some exceptions exist, employees do not rotate among mine sites, nor do they work regularly at more than one mine. The hourly employees at the four mine sites are represented by four different union locals. Also, employees at one mine may not bid on a job vacancy at another mine; they may only bid on job vacancies at the mine in which they presently work. Third, …. Finally, each mine has its own gate, parking lot, office building and bathhouse.

*Id.* at 726 (footnote omitted).

Additionally, in rejecting the Union's shared "operational purpose" contention, the Eleventh Circuit reasoned:

> While the phrase "operational purpose" is vague and undefined, it may imply that non-contiguous sites—at the very least—share some management and personnel. It clearly must mean more than "produce the same product." <u>The mines at issue all produce coal, but they do so independently of one another</u>. Each mine's tonnage requirements are different, and the production of coal at one mine does not depend on the production of coal at another mine. Their "operational purposes," beyond the production of coal, are not coextensive.

*Id.* at 727; *see also* 20 C.F.R. § 939.3(i) (1992) ("For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.") (emphasis added).

While admittedly *Jim Walter Resources* addresses the application of WARN to a solitary employer working within the mining industry as opposed to multiple employers operating the same type of service-related businesses and sharing a common commercial venue provided by their shared unified employer, such as is the situation here, the precedent still provides useful insight into those factors which the Eleventh Circuit found to be particularly illustrative when evaluating a single site of employment theory, *i.e.*, separate management, distinct workforces, and independent aspects of operations. *See also id.* ("The undisputed facts confirm that the day-to-day management and employee structures at the four mines are fundamentally distinct.") (emphasis added). Further, when considering all these categories, only one outcome is apparent–DHL's Birmingham-based independent contractors without any management or workforce overlap,[18] simply by virtue of entering into similarly worded contractual agreements designed to protect DHL and its brand and utilizing

---

[18] *Cf., e.g., Davis v. Signal Int'l Texas GP, L.L.C.*, 728 F.3d 482, 487 (5th Cir. 2013) (finding single site of employment when "sharing of staff between the yard and annex was not merely occasional but in fact regular, with certain employees maintaining offices at both buildings, regular visits by personnel from one facility to the other, and use of the same security, payroll, and other staff").

the same DHL package facility, do <u>not</u> constitute a single site of employment under WARN.

Therefore, consistent with DOL interpretative regulations that separate employers conducting activities within a common area should not constitute a single site of employment, 20 C.F.R. § 639.3(i)(2),[19] persuasively guided by the Eleventh Circuit's reasoning in *Jim Walter Resources* and, in the absence of any countervailing <u>binding</u> precedent suggesting that employees who were hired and then laid off by separate delivery contractors that are geographically based out of the same facility provided by a shared secondary employer is a single site of employment to trigger WARN notice-related liability for that common employer,[20] DHL's Motion is granted

---

[19]   While § 639.3(i)(6) makes it clear that the "home base" for all of WAF's couriers is appropriately classified as a "single site of employment," none of the DOL interpretative guidelines provides that employees who work exclusively for separate primary employers, but who also report to a common work-related location that is furnished by the same unified employer are collectively considered to be a "single site of employment."

[20]   The court acknowledges that the DOL interpretative guidelines do provide for a "truly unusual organizational situation" as another way to meet the single site of employment definition, 20 C.F.R. § 639.3(i)(8), but finds that extending that particular provision to allow for the aggregation of employees with different primary employers to meet WARN's notice threshold is beyond the reach of what Congress intended with WARN. As the Eighth Circuit Court of Appeals has explained:

> Under this exception, two or more apparently separate sites may be deemed a "single site" if other criteria set out by the DOL do not reasonably apply. The case which best defines this exception is *Carpenters Dist. Council v. Dillard Dep't Stores,* 15 F.3d 1275, 1290 (5th Cir. 1994), *cert. denied,* 513 U.S. 1126, 115 S. Ct. 933, 130 L. Ed. 2d 879 (1995). In *Carpenter's Dist. Council,* the court held that two separate locations were a "single site" when employees, housed together, were split off into a different building due to space considerations yet continued to perform the same

on *prima facie* grounds.

## V.      Conclusion

Accordingly, for the reasons explained above, the Motion is due to be granted

on the basis that Mr. Likes is unable to prima facially establish his WARN claim.

Further, the remainder of the Motion is due to be termed as moot. The court will enter

a separate final judgment order dismissing Mr. Likes's complaint with prejudice.

**DONE** and **ORDERED** this 10th day of June, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

functions. In the situation at hand, there is nothing unusual about the organization of the St. Louis and St. Charles County sites. Any connection between the two sites is nothing more than that present in most large corporate organizations.

*Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1281 (8th Cir. 1996). There is no intra-company space-driven workforce splitting issue involved here or anything else "truly unusual" from an organizational standpoint to warrant coverage under § 639.3(i)(8).